RACINE-SATTLEY COMPANY, APPELLANT, V. NELS HANSEN
ET AL., APPELLEES.

FILED MAY 21, 1909.    No. 15,680.

1. **Conditional Sales: VALIDITY.** "A condition in a contract of sale,
whereby the title is to remain in the vendor until the full amount
of the contract price is paid, is void as against purchasers and
judgment creditors of the vendee in actual possession, unless re-
duced to writing, signed by the vendee, and a copy thereof filed
with the county clerk or register of deeds of the proper county."
*Johns & Sandy v. Reed,* 77 Neb. 492.

2. **Evidence** examined and set out in the opinion *held* sufficient to
sustain the verdict of the jury and judgment of the court.

APPEAL from the district court for Cedar county: GUY
T. GRAVES, JUDGE. *Affirmed.*

*Rich, O'Neill & Gilbert, Bryce Crawford, H. E. Burkett*
and *J. W. Woodrough,* for appellant.

*R. J. Millard* and *C. H. Whitney, contra.*

FAWCETT, J.

On March 24, 1906, one Nels Hansen was engaged in the
business of selling farm implements at retail at Magnet,
in Cedar county. On that date plaintiff sold him quite
a large quantity of agricultural implements, and took
from said Hansen a written contract, which, among other
things, provided that upon receipt of the goods, or upon
monthly balances, at the option of Hansen, the said Han-
sen should execute notes to the plaintiff for the amount
to be paid for the goods so received according to the terms
of said written contract, and that all goods ordered there-
after for that season's trade should be subject to the same
conditions as to time and manner of payment as those
then being ordered. The plaintiff agreed to give Hansen
the exclusive sale of the goods of the classes then ordered
at Magnet and vicinity for the season ending July 31,

1906, and Hansen agreed not to buy or sell any other makes or like goods for the same period, and not to countermand the order then given or any part of it except upon payment of 20 per cent. of the net amount of the goods purchased as liquidated damages. The contract further provided: "In case of death of member of firm making this contract, or if the purchaser under this contract sells out, fails or becomes insolvent, or any member of the purchasing firm fails, sells out or becomes insolvent, all accounts or notes for goods purchased under this contract, including renewal notes, regardless of who holds said notes, shall then become due and payable, whether the notes be given in payment for goods or accounts or as collateral security thereto. The purchaser agrees to settle promptly for any part of the above order, with exchange, by note or accepted draft for all time bills, and cash or its equivalent for all cash bills, and further agrees that all notes of the undersigned are to be secured by good farmers' notes, proceeds of sales of an equal amount and 20 per cent. in addition as collateral security to said notes, whenever so requested by the Racine-Sattley Company of Nebraska. The title to the goods (and all proceeds of any sale of same), for which this order is given, and all goods subsequently ordered and the proceeds of sale thereof to remain in the name of the Racine-Sattley Company of Nebraska until the same are settled for with cash; and notes or accepted drafts given are not accepted as payment, but only as evidence of indebtedness." This contract was not filed in the office of the county clerk of the county, or in any manner made a matter of publicity. Hansen gave his notes for the agreed price of the goods delivered under the contract, which notes were not yet due by their terms at the time of the occurrence of the subsequent events which gave rise to this litigation. Hansen continued to conduct the business, with what success is not disclosed, until on or about July 20 of the same year, when he traded his entire stock, including the unsold portion of the stock covered by the contract, and other

goods which had subsequently been delivered to him by the agent of plaintiff, to Dr. J. M. Talcott of Crofton for an equity in a farm.    Dr. Talcott duly signed and acknowledged an assignment of his contract for the land in question, but under an agreement with Hansen placed the contract with such assignment indorsed thereon in a bank at Crofton, in which Talcott was a stockholder, and in the banking house of which he had his office.    Under the written contract entered into between Dr. Talcott and Hansen on July 20, Hansen guaranteed all his implement stock as that day invoiced "to be complete in 30 days from date and all extra stock now in building not invoiced.   *   *   *   Said Talcott to place contract for land in F. S. Bank, Crofton, to be left for 30 days from day when it shall be turned to said Hansen if said J. M. Talcott finds implement stock complete as stated."

It is evident from this that Dr. Talcott was taking the stock on Hansen's invoice, and was reserving to himself thirty days' time in which to verify the correctness thereof. If found to be correct, then the assignment of the land contract to be delivered to Hansen.    Hansen on his part immediately delivered possession of the stock and business to Dr. Talcott, who placed a man in charge, and for about ten days the business was conducted regularly, so far as the evidence discloses, by Dr. Talcott's agent.    About ten days after Dr. Talcott took possession of the stock and began conducting the business, one E. R. Sutton entered into negotiations with Dr. Talcott for a trade of some farm land for the stock of goods.    Pending these negotiations Sutton got in communication with the defendant, Gillilan, and proposed to trade the stock which he was to get from Talcott to Gillilan for one of Gillilan's farms. After some negotiations Gillilan signified his willingness to make the exchange, he to turn in his quarter section of land at $30 an acre, and to take the stock at invoice prices, and settlement to be made for the difference, whichever way it might be.    Sutton thereupon stated to Gillilan that in his trade with Talcott he (Sutton) would have

to raise $1,400 in cash, but that he did not have the money on hand, or words to that effect. It was then agreed between Sutton and Gillilan that Gillilan would advance $1,400 to enable Sutton to complete his deal with Talcott, and that he (Gillilan) would take from Sutton a mortgage back on the land, which he was conveying to Sutton, for the $1,400. Thereupon Gillilan, by direction of Sutton, drew a check for $1,400 upon his account in the Hartington National Bank, payable to the order of Dr. Talcott. After the taking of the inventory was completed, Sutton called up Dr. Talcott at Crofton by telephone, and told him of the arrangement, stating that Gillilan would pay him $1,400 cash. Gillilan was then placed in communication with Talcott and confirmed Sutton's statement, stating that he was ready to turn over the check as soon as possession of the stock and business was turned over to him. Thereupon Talcott instructed his agent in charge of the business to turn over the stock to Gillilan upon Gillilan's delivering to him the check for $1,400. The check was delivered, and possession of the stock and business turned over to Gillilan by Talcott's agent. Gillilan conducted the business for two days, when an agent of the plaintiff appeared upon the scene and claimed to Gillilan that the stock belonged to Hansen, and that plaintiff had a mortgage on it and wanted to take the stock, which Gillilan refused to deliver up. Gillilan then called up Dr. Talcott and told him of the claim that was being made by plaintiff's representative, and advised Dr. Talcott that he (Gillilan) was going to stop payment on the check. Gillilan also called up his bank at Hartington and instructed them not to pay the check until further notice. The undisputed evidence of Dr. Talcott is that he had indorsed the check, and deposited it in the Crofton bank, and obtained credit for the $1,400 prior to the time that Gillilan notified him that plaintiff was claiming the stock and that he was going to stop payment on the check. Gillilan's testimony, which is not contradicted by the plaintiff's representative, John F. Day, who was present at the trial and testified as

a witness, is that Day made no claim to him that plaintiff
was the owner of the stock, but on the contrary, insisted
that Hansen owned the stock and that plaintiff had a mort-
gage on it.   Gillilan subsequently had the records exam-
ined, and, finding that there was not any mortgage on
record against the stock, instructed his bank to pay the
$1,400 check, which was done.   Finding that Gillilan
would not deliver up the stock, the attorney of the plaintiff
was sent for and the stock taken by plaintiff under the
writ of replevin in this action.   The action was tried in
the district court for Cedar county to the court and a
jury.   The jury returned a verdict "that at the commence-
ment of this action the defendant Frank M. Gillilan had
the right of property and was entitled to the possession of
the property replevied herein, and we assess the value
thereof at $3,089.78."   From a judgment upon that ver-
dict this appeal is prosecuted.

Plaintiff's first contention is that the sale to Hansen was
a conditional sale, and that the stock remained, and at
the time it was replevied was, the property of plaintiff.
Conceding this to be true, plaintiff must still fail in this
action, unless the record shows that Dr. Talcott had knowl-
edge or notice which would put a reasonable person upon
inquiry that plaintiff had title to the property.   Dr. Tal-
cott testified that, at the time he made the deal with Han-
sen and obtained the possession of the stock, he had no
knowledge or notice whatever of any claim or interest of
the plaintiff therein.   Gillilan also testified that, at the
time he made the deal with Sutton and Talcott, he had
no knowledge or notice of any interest or claim of plain-
tiff in the stock.   A careful examination of the entire
record fails to disclose any evidence which in any man-
ner contradicts or impeaches the testimony of either.   So
far as this record discloses, Talcott and Sutton and Gilli-
lan were all acting in the utmost good faith, so far as
plaintiff was concerned, without any knowledge or notice
of anything to put them upon inquiry as to any secret
        37

ownership of plaintiff or any one else in the stock. Plaintiff contends that regardless of the question as to whether they had any knowledge or notice of plaintiff's claim at the time of entering into the negotiations, Gillilan had knowledge of plaintiff's claim prior to the time he paid for the stock, or at least prior to the time the check he had given had been paid by his bank; that he at least knew of the fact in time, and that he did in fact stop payment upon the check; and that, if he subsequently instructed his bank to pay the check, it was at his own risk.

Plaintiff insists further that there is no evidence that Gillilan had ever conveyed the farm to Sutton, which he testifies he was to give Sutton as a consideration for the stock. Upon the latter question the evidence is somewhat meager, but we think it was sufficient to warrant the jury in finding, as it must have found, that the farm had been conveyed to Sutton. Gillilan testified without objection that he had the stock of goods in his possession at the time they were taken under the writ of replevin in this suit. "Q. How did they come into your possession? A. I had bought them and paid for them and had them in my possession about three days." In regard to the $1,400, he testified that Sutton said "he couldn't put up the $1,400, but, if I would carry him back for this $1,400 that he would have to pay on the stock, and I agreed to it. There was a little mortgage on the land, and we took a second mortgage on the land." Again he testified: "I put my farm in at $4,800—$30 an acre." We think the argument of counsel for Gillilan is sound, that his testimony that "we took a second mortgage on the land," and that he "put in his farm at $4,800," is tantamount to testifying that he had deeded the land to Sutton; that he could not have taken a second mortgage back unless he had conveyed the title. In the absence of any contradictory evidence, we think this was sufficient to warrant the jury in finding that Gillilan had deeded the land to Sutton. As to the $1,400 check, we think it is immaterial whether the check had actually been paid by

the Hartington bank before Gillilan received notice of the fact that plaintiff was claiming a lien upon it, for two reasons: First, Dr. Talcott had in good faith and without fraud sold and delivered the stock to Gillilan. Gillilan had conveyed the land to Sutton and had thereby paid the full consideration for the stock. The check given to Dr. Talcott was nothing more nor less than a loan by Gillilan to Sutton, secured by a second mortgage upon the land which he had conveyed to Sutton, and, having received the mortgage for the $1,400 and delivered the check in consideration therefor, he had no right or authority to stop payment of the check. His subsequent instruction to his bank therefore was an immaterial matter, so far as this case is concerned. If Gillilan had persisted in his instructions to his bank to refuse payment of the check, Talcott could have brought suit upon the check and recovered judgment against Gillilan therefor. By the delivery of his check to Talcott in the manner shown by the evidence, all control over that check had passed from Gillilan. The transaction between himself and Sutton was complete and irrevocable upon the part of either. Second, even if the $1,400 had constituted a part of the consideration which Gillilan was to pay for the stock, he was warranted in recalling his stop order to his bank when he discovered that plaintiff had no such interest in the stock as it claimed to have in Day's conversation with him. Gillilan testified unqualifiedly that Day's statement to him was that Hansen owned the stock and that plaintiff had a mortgage upon it. This testimony Day does not attempt to contradict. When Gillilan had the records examined and found that the claim was untrue, he was justified in withdrawing his stop order and allowing the check to go through.

With the moral turpitude of Hansen in selling this stock of goods for which he had not paid we have nothing to do, nor can any blame attach to Talcott, Sutton or Gillilan for the same, unless they had guilty knowledge of it, which, as we have seen, the evidence in the record

before us fails to show. But, from a careful reading of
the contract, we are not entirely satisfied that Hansen
was guilty of any fraud in selling the stock to Dr. Tal-
cott. The contract seems to contemplate the right of
Hansen to "sell out" at any time he might see fit so to
do. It provided that "in case  *  *  * , the purchaser
under this contract sells out,  *  *  * all accounts or
notes for goods purchased under this contract, including
renewal notes, regardless of who holds said notes, shall
then become due and payable." And in the clause provid-
ing that the title to the goods should remain in plaintiff,
the contract recites: "The title to the goods (and all pro-
ceeds of any sale of same), for which this order is given,
*  *  * to remain in the name of the Racine-Sattley
Company of Nebraska until the same are settled for with
cash." A fair construction of this language would seem
to indicate that Hansen might "sell out," but that, in case
he did so, all proceeds of the sale should, in lieu of the
stock sold out, remain in the name of plaintiff. Under
this wording of the contract, while plaintiff might be en-
titled to demand the land contract assigned by Dr. Talcott
to Hansen in payment for the stock, it does not necessarily
follow that Hansen acted fraudulently in the matter.
That his conduct will bear that construction, how-
ever, must be conceded. The verdict of the jury amounts
to a finding that defendant Gillilan was an innocent
purchaser of the stock in controversy for a valuable con-
sideration, and that plaintiff wrongfully took such pos-
session from him. These were questions peculiarly for
the jury, and we cannot disturb their finding.

Complaint is made by the plaintiff that the value of
the property as found by the verdict is not sustained by
the evidence. This contention must also fail. Hansen
was placed upon the stand as a witness. He testified that
he had been engaged in the implement business for nearly
20 years; that he had been thus engaged in the retail
business in and around Magnet for about 2½ years; that
he was acquainted with the fair market value of goods

such as were replevied; that he was acquainted with the
fair market value of the goods taken, in Magnet, at the
time they were replevied, and that their fair and reason-
able value was $3,872.50. The only other witness who
testified as to the value was plaintiff's representative, Mr.
Day, who testified that he knew the stock and value of it,
and that it was worth $2,766.20 in the wholesale house at
Omaha, to which there should be added the freight and
drayage from Omaha to Magnet. Plaintiff complains
because Day was not permitted to testify what the freight
charges from Omaha to Magnet would amount to. This
was not error, as no offer was made to prove the facts
which would have been elicited if the answers to the ques-
tions propounded had been permitted by the court. *Alter
v. Covey,* 45 Neb. 508.

Plaintiff further contends that the verdict of the jury
should be set aside because "the verdict of the jury is a
compromise and the jury's guess"; in other words, that
they did not find the exact amount which either Hansen
or Day testified to, but returned their verdict for an
amount between the two, viz., $3,089.78. The jury, after
hearing the witnesses and seeing them upon the stand,
refused to take the exact figures of either, but arrived at
what they found was the fair value of the property. The
amount of their verdict is so materially less than that
testified to by Mr. Hansen, and so little in excess of that
testified to by Mr. Day, that it is clear the jury were not
influenced by passion or prejudice against plaintiff.
After hearing all of the evidence, the jury exercised their
own judgment as to the value of the goods. This we think
they had a right to do.

Plaintiff next insists that the verdict is contrary to
instruction No. 6, given by the court upon its own mo-
tion. This instruction reads as follows: "If the jury
believes from the preponderance of the evidence that the
defendant Frank M. Gillilan had knowledge of the con-
tract of purchase under which Nels Hansen purchased
the goods in question, or had knowledge of the fact that

the purchase price had not been paid, if that be a fact, or if you find that the purchase price was not paid by the said Gillilan until notice sufficient to put a careful and prudent person upon inquiry which would lead to a discovery of the fact, if it be a fact, that said goods had not been paid for by the defendant Hansen, then F. M. Gillilan would not be an innocent purchaser, and you should find for the plaintiff, and so say by your verdict." The verdict was certainly not contrary to this instruction, but was in entire harmony with it.

The remaining contention of plaintiff is that the court erred in refusing to give instruction No. 1 requested by appellant, which was an instruction directing the jury to return their verdict in favor of the appellant. In refusing to give this instruction the court did not err.

We have examined the alleged "errors in reception and rejection of evidence," but are unable to agree with counsel for plaintiff that there was any prejudicial error in the rulings of the court complained of.

Finding no prejudicial error in the record, the judgment of the district court

AFFIRMED.